# United States Court of Appeals
## For the First Circuit

No. 04-1012

LINDA J. STEIR m/n/f of MARIKA STEIR,

Plaintiff, Appellant,

v.

GIRL SCOUTS OF THE USA;
SPAR & SPINDLE COUNCIL,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Torruella and Howard, Circuit Judges,

and Stearns,[*]District Judge.

Amy B. Messer for appellant.
Kenneth Kirschner with whom Patricia A. Cody and Jennifer L.
Parent were on brief for appellee Girl Scouts of the USA.
Richard G. Pichette with whom Paul T. Muniz was on brief for
appellee Spar & Spindle Council.

September 3, 2004

---

[*]Of the District of Massachusetts, sitting by designation.

**STEARNS**, **District Judge**.    This appeal arises from a failed discrimination lawsuit brought on behalf of Marika Steir by her mother, Linda Steir, against the Girl Scouts of the USA (Girl Scouts) and Spar & Spindle Council, a regional agency that supervises local Girl Scout troops.    Because the case was ultimately dismissed for reasons that are not a reflection on the merits of the complaint, we will only lightly sketch the underlying allegations.

Marika Steir has been afflicted with cerebral palsy since birth.    Although Marika requires the use of a wheelchair for mobility, and a computer console for communication, she leads an active life.    She became a member of Spar & Spindle's Girl Scout Troop 467 in Atkinson, New Hampshire, as a second-grader in 1994, and remained a Girl Scout until 1999 when she entered the seventh grade.    For most of that time, Marika was happy with scouting, earning numerous merit badges and enjoying a good relationship with her fellow scouts and troop leaders.

Marika alleges that beginning in 1997, discriminatory conduct on the part of Girl Scout troop leaders cast a pall over her scouting experience. Specifically, Marika cites a 1998 camping trip planned for the girls of her troop to a campground that lacked handicapped-accessible restrooms, an excursion taken the same year to an indoor amusement park which offered no activities in which she could participate, and meetings that were held at a troop

leader's home, the front steps of which Marika could not negotiate in her wheelchair. Marika's mother sought to transfer Marika to a neighboring troop whose leader she thought would be more sensitive to Marika's physical limitations. The troop leader, however, refused to enroll Marika, allegedly because of her disabilities. Although Marika remained an active member of Troop 467 during the 1998-1999 scouting season, Linda Steir was unable to obtain a firm guarantee of appropriate accommodations for Marika from officials of Spar & Spindle. On September 16, 1999, in response to an invitation to register Marika for the 1999-2000 scouting year, Linda Steir wrote to Marika's troop leader that "Marika will not be joining Girl Scouts this year." Marika thereafter ceased all participation in scouting.

On February 1, 2000, Marika filed a discrimination charge against the Girl Scouts and Spar & Spindle with the New Hampshire Commission for Human Rights. On July 19, 2000, at the request of Marika's counsel, the Commission terminated its investigation and authorized the filing of a lawsuit.

On August 11, 2000, a complaint was filed by Linda Steir as mother and next friend of Marika against the Girl Scouts and Spar & Spindle in the Rockingham County Superior Court. The complaint asserted violations of New Hampshire's Law Against Discrimination, N.H. Rev. Stat. Ann. § 354-A, and claims of intentional and negligent infliction of emotional distress. On

September 20, 2000, the case was removed by the defendants to the United States District Court on diversity of citizenship grounds, 28 U.S.C. § 1441. On November 1, 2000, the district court permitted Marika to amend her complaint by adding a claim for injunctive relief under Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq.[1] (The negligent infliction of emotional distress count was voluntarily dismissed).

On November 9, 2000, the district court adopted the parties' jointly proposed scheduling order. The order provided that discovery would be concluded on November 30, 2001, that motions for summary judgment would be filed by January 15, 2002, and that the parties would be ready for trial on April 1, 2002. On December 7, 2001, a week after the agreed date for the close of discovery, Marika moved to amend her complaint further by adding a claim for money damages under the federal Rehabilitation Act, 29 U.S.C. § 794. With the motion to amend, Marika also filed a motion for partial summary judgment seeking a declaration that the Girl Scouts and Spar & Spindle are places of public accommodation within the meaning of Title III of the ADA.[2] On December 27, 2001, the

---

[1]Title III of the ADA authorizes the award of injunctive relief to "any person who is being subjected to discrimination on the basis of disability." 42 U.S.C. § 12188(a)(1).

[2]We offer no opinion (nor did the district court) on the issue of whether the Girl Scouts and Spar & Spindle are in fact "places of public accommodation" for ADA purposes.

district court denied the motion to amend.[3] Shortly thereafter, the court continued the April 1, 2002 trial date while it considered the parties' motions for summary judgment.

On September 10, 2002, the district court entered judgment for the defendants on the intentional infliction of emotional distress claim. The court also indicated in its memorandum that it had come to the tentative conclusion that Marika lacked standing to pursue injunctive relief under the ADA. After inviting submissions on the issue from the parties, the district court on April 2, 2003, definitively so ruled. On October 29, 2003, the New Hampshire Supreme Court, answering a question certified by the district court, ruled that the disability tolling provision of N.H. Rev. Stat. Ann. § 508:8 did not relieve Marika of strict observance of the 180-day limitation period on the filing of a charge under the New Hampshire Law Against Discrimination and that her statutory claims were therefore time-barred. Steir v. Girl Scouts of the U.S.A., 150 N.H. 212, 834 A.2d 385 (N.H. 2003). Final judgment entered for the Girl Scouts and Spar & Spindle on November 24, 2003. A timely notice of appeal was filed, claiming error in the district court's denial of the motion to amend the complaint and in its ruling that Marika lacked standing under Title III of the ADA.

---

[3]A motion to reconsider was denied by the district court on September 11, 2002.

DISCUSSION

A.   The Motion to Amend

A motion to amend a complaint will be treated differently depending on its timing and the context in which it is filed. A plaintiff is permitted to amend a complaint once as a matter of right prior to the filing of a responsive pleading by the defendant. Fed. R. Civ. P. 15(a). Thereafter, the permission of the court or the consent of the opposing party is required. The default rule mandates that leave to amend is to be "freely given when justice so requires," id., unless the amendment "would be futile, or reward, inter alia, undue or intended delay." Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994).

As a case progresses, and the issues are joined, the burden on a plaintiff seeking to amend a complaint becomes more exacting. Scheduling orders, for example, typically establish a cut-off date for amendments (as was apparently the case here).[4] Once a scheduling order is in place, the liberal default rule is replaced by the more demanding "good cause" standard of Fed. R. Civ. P. 16(b). O'Connell v. Hyatt Hotels of P.R., 357 F.3d 152, 154-155 (1st Cir. 2004). This standard focuses on the diligence

---

[4]According to an affidavit filed by counsel for the Girl Scouts in opposition to the motion to amend, the parties had agreed that any further amendments to the complaint would be submitted by November 15, 2000. Although this date is not reflected in the district court's November 9, 2000 docket entry memorializing its scheduling order, we do not understand this to be a matter of dispute.

(or lack thereof) of the moving party more than it does on any prejudice to the party-opponent.[5] Id. Where the motion to amend is filed after the opposing party has timely moved for summary judgment, a plaintiff is required to show "substantial and convincing evidence" to justify a belated attempt to amend a complaint. Gold, 30 F.3d at 253.

Regardless of the context, the longer a plaintiff delays, the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend. Acosta-Mestre v. Hilton Int'l of P.R., Inc., 156 F.3d 49, 52-53 (1st Cir. 1998). Particularly disfavored are motions to amend whose timing prejudices the opposing party by "requiring a re-opening of discovery with additional costs, a significant postponement of the trial, and a likely major alteration in trial tactics and strategy . . . ." Id. at 52. We review the denial of a motion to amend under Rule 15(a) for an abuse of discretion, and we "defer to the district court if any adequate reason for the denial is apparent on the record." Grant v. News Group Boston, Inc., 55 F.3d 1, 5 (1st Cir. 1995).

That the motion to amend by adding the Rehabilitation Act

---

[5]The district court relied on both grounds, lack of diligence and prejudice, in denying the motion to amend. Its December 27, 2001 order cited the failure of the plaintiff "to demonstrate that she could not have filed the motion to amend at an earlier point where unfair prejudice could have been avoided."

claim, if granted, would have prejudiced the Girl Scouts and Spar & Spindle by injecting a new theory of relief into the litigation, goes without saying. Title III of the ADA, the gravamen of the original amended complaint, permits only equitable relief, while the Rehabilitation Act has been judicially construed to permit the recovery of money damages. See Schultz v. Young Men's Christian Ass'n of the United States, 139 F.3d 286, 290 (1st Cir. 1998). In defending against the Steirs' lawsuit, the Girl Scouts and Spar & Spindle made a tactical decision to forego any attempt to explore the basis and extent of Marika's claim for compensatory damages.[6] To delve into this issue at the penultimate phase of the litigation would have required the re-opening of discovery to permit a deposition of Marika and the obtaining of any relevant medical records, a postponement of the hearing scheduled on the pending motions for summary judgment, and almost certainly, the delay of any trial. The issue thus is not whether allowing the amendment would have been prejudicial – it would have been – but whether it would have been unfairly so.

Marika argues that no unfairness was involved because the

---

[6]Although Marika had brought a claim under the New Hampshire Law Against Discrimination and a common-law claim for the intentional infliction of emotional distress, both of which allow for an award of money damages, the defendants correctly anticipated that the state statutory claim was time-barred, and that Marika would be unable to show that she had suffered emotional distress as a result of "extreme and outrageous conduct," as New Hampshire law requires. See Morancy v. Morancy, 134 N.H. 493, 496, 593 A.2d 1158, 1159 (N.H. 1991).

reason for the delay lies squarely at the feet of the Girl Scouts and Spar & Spindle. An indispensable jurisdictional element of a Rehabilitation Act claim is a showing that a defendant accused of discrimination is a recipient of federal financial assistance. Schultz, 139 F.3d at 288. Marika asserts that she was frustrated in her efforts to bring a timely Rehabilitation Act claim by the defendants' misleading and incomplete discovery responses and their willful concealment of their financial relationships with the federal government.

The issue of federal financial assistance made its first appearance in an interrogatory propounded by Marika's counsel to the Girl Scouts, which was duly answered on March 7, 2001. The interrogatory asked whether the Girl Scouts "continue to be the recipient of equipment and/or supplies and/or services from the federal, state, or local government . . . ." The interrogatory further asked whether the Girl Scouts maintained any special relationships with government officials or their spouses. To this interrogatory, the Girl Scouts (after interposing standard objections) responded:

> Yes. The First Lady of the United States has always been the Honorary President of GSUSA. To our best knowledge, GSUSA does not receive equipment or supplies from any federal, state or local government. GSUSA does have memoranda of understanding with several federal agencies.

No effort was made by Marika's lawyers to investigate or obtain copies of the memoranda of understanding until October 15, 2001,

when Marika's counsel wrote to the lawyer for the Girl Scouts to confirm an agreement for their voluntary production in connection with the deposition of Carol McMillan, the Girl Scouts' National Director of Council Services, then scheduled for October 18, 2001, and later rescheduled for November 30, 2001, the final day of discovery.

Spar & Spindle, in its March 27, 2001 answer to the same interrogatory, disclosed that it "participates in the milk and surplus food program through the New Hampshire Department of Education." The implications of this answer again were not pursued by Marika's counsel until the August 30, 2001 deposition of Judith Wise, the Executive Director of Spar & Spindle. During this deposition, as Marika concedes in her brief, a scouting spokesperson "for the first time . . . indicated in [a] real way that the Girl Scouts did in fact, receive federal assistance." Despite this acknowledgment, the motion to amend was not filed for another three months and then only after discovery had closed.

To be sure, we are deeply troubled by the Girl Scouts' March 7 interrogatory answer. While the answer was, as the Girl Scouts argues, literally true (in the sense that the Girl Scouts did not receive equipment or supplies, but only money from the federal government), we find the response at best artful, and at worst calculated to deceive. A defendant is not, of course, obligated to perfect a plaintiff's litigating strategy by pointing out potential

causes of action that the plaintiff has neglected to bring.  Nor is a party required to make heroic exertions to divine the intent of an opaque, ambiguous, or clumsily worded discovery request.  But the spirit of the Civil Rules requires that a party be responsive, complete, and forthcoming in its answer, which the Girl Scouts was not.  Cf. Fusco v. General Motors Corp., 11 F.3d 259, 265 (1st. Cir. 1993).

If the March 7 interrogatory answer was all that the record had to say on the subject, we would see the case in a different light, as any "undue delay" in seeking to amend the complaint would be fairly attributable to the Girl Scouts' evasive response.  However, the inquiry is not limited to a defendant's conduct: "[w]hat the plaintiff knew or should have known and what [s]he did or should have done are [also] relevant to the question of whether justice requires leave to amend under [the] discretionary [Rule 15(a)] provision."  Leonard v. Parry, 219 F.3d 25, 30 (1st Cir. 2000).  The failure of Marika's counsel to inquire into the memoranda of understanding that were mentioned in the answer to the interrogatory is inexplicable.  While counsel's failure to immediately investigate Spar & Spindle's disclosure that it was a participant in a milk and surplus food program run by the State of New Hampshire is understandable, counsel's failure to take any action after the August 30 deposition of Ms. Wise, when as Marika acknowledges, she was directly told that Spar & Spindle and the Girl

-11-

Scouts received federal financial assistance, is not. This somnolence in the face not only of the warning flags but also the onset of the storm compels the conclusion that despite the Girl Scouts' equivocation on the issue of financial aid, the record reveals an adequate reason for the district court's denial of the motion to amend.[7] While it would have been well within the discretion of the district court to allow the motion, it was not an abuse of discretion to deny it.

B. <u>Standing</u>

The burden of establishing standing rests with the party invoking federal jurisdiction. <u>Bennett</u> v. <u>Spear</u>, 520 U.S. 154, 167-168 (1997). Three elements must be shown: (1) an injury-in-fact; (2) causation; and (3) redressability. <u>Benjamin</u> v. <u>Aroostock</u>

---

[7]Defendants make note of the fact that Marika's parents were aware prior to the filing of the complaint that the Girl Scouts is a publicly funded charitable organization. In an October 3, 1999 letter to the Assistant Executive Director of Spar & Spindle, the Steirs complained that "[t]here is something inherently wrong with the fact that the Girl Scouts can take advantage of the Federal tax laws under 501(c) *and be publicly funded* and, at the same time show a consistent pattern of blatant defiance of the ADA laws." (Emphasis added). The Girl Scouts' 501(c)(3) status as a tax exempt charitable organization was also noted in the complaint. While it may be true, as Marika argues, that her parents did not grasp the legal significance of the distinction between "publicly funded" and "federally assisted," the Girl Scouts' 1997, 1998, and 1999 Form 990 exempt organization tax returns, which were posted on the Internet at the time the lawsuit was filed, clearly indicated the receipt of substantial government contributions and grants. <u>Cf.</u> <u>Poulin</u> v. <u>Greer</u>, 18 F.3d 979, 984 (1st Cir. 1994)(where a party has failed to supplement an incomplete response, the party will be excused where it reasonably believed that the withheld information was known or otherwise available to the opposing party).

<u>Medical Center, Inc.</u>, 57 F.3d 101, 104 (1st Cir. 1995).  To satisfy the first element, a plaintiff must demonstrate that she "'has sustained or is immediately in danger of sustaining some direct injury' ... [that] must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" <u>City of Los Angeles</u> v. <u>Lyons</u>, 461 U.S. 95, 102 (1983).  Second, "the injury has to be 'fairly ... trace[able] to the ... [conduct] of the defendant, and [must] not [be] ... th[e] result [of] the independent action of some third party not before the court.'" <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).  And finally, "it must be 'likely,' as opposed to merely 'speculative' that the injury will be 'redressed by a favorable [judicial] decision.'" <u>Id.</u> at 561.  A district court's determination that a plaintiff lacks standing is a question of law that is reviewed <u>de novo</u> on appeal.[8]  <u>Benjamin</u>, 57 F.3d at 104.

---

[8]Where, as here, the determination of standing involves the resolution of factual disputes going beyond the face of the complaint, the prevailing rule applies a clearly erroneous standard to the district court's fact-finding.  <u>See</u>, <u>e.g.</u>, <u>Rent Stabilization Ass'n</u> v. <u>Dinkins</u>, 5 F.3d 591, 594 (2d Cir. 1993).  The First Circuit has yet to definitively choose between a Rule 12(b)(1) "clearly erroneous" or a Rule 12(b)(6)<u>de novo</u> standard of review.  <u>United States</u> v. <u>AVX Corp.</u>, 962 F.2d 108, 114 n.6 (1st Cir. 1992) (an issue "for another day").  Because we are of the view that the outcome would be the same under either standard, we need not now make the choice. We also note that Marika's assertion that the district court "*sua sponte*" dismissed her ADA claim and that we must therefore "take an extra step, scrutinizing the proceedings carefully" to insure that she was treated fairly is not borne out by the record.  While the district court raised the standing issue on its own, it invited briefs from the parties before making a definitive ruling.  We do not of course mean to imply that we have not examined the record with requisite care.

In dismissing Marika's ADA claim for want of standing,[9] the district court in its September 10, 2002 memorandum of decision found that

> the record is devoid of any evidence suggesting that Marika plans to return to the Girl Scouts. She thus faces no threat of future harm or discrimination from the defendants and therefore lacks standing to obtain injunctive relief.

Standing in the jurisdictional sense is based on the facts as they existed at the time the complaint was filed. Manqual v. Rotger-Sabat, 317 F.3d 45, 58 (1st Cir. 2003). But a plaintiff's stake in a case is not frozen at the moment the lawsuit is filed. She must maintain a personal interest in the outcome throughout the litigation or the controversy becomes moot and unjusticiable despite the court's retention of subject matter jurisdiction. See Matos v. Clinton School District, 367 F.3d 68, 71 (1st Cir. 2004) (a cognizable case or controversy must exist not only at the outset of the lawsuit, but at all stages of the litigation, including appeal). The distinction between standing and mootness is not always easily grasped. "The confusion is understandable, given [the Supreme Court's] repeated statements that the doctrine of mootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of

---

[9]Standing requirements under the ADA are at least as strict as they are under Article III. See 15 Moore's Federal Practice § 101.62[1] (Matthew Bender 3d ed.) ("The test for standing under a statute may be more rigorous but not more lenient than the Article III requirements.").

-14-

the litigation (standing) must continue throughout its existence (mootness).'" <u>Becker</u> v. <u>Federal Election Commission</u>, 230 F.3d 381, 387 n.3 (1st Cir. 2000) (citation omitted).[10]

It will be recalled that in responding to the invitation to attend the inaugural meeting of the 1999-2000 scouting year, Marika's mother wrote that Marika would not be rejoining the Girl Scouts. By the time the amended complaint was filed in the district court on November 1, 2000, Marika had been out of scouting for more than a year. Nothing in the complaint indicated that Marika had any desire to resume her scouting career. Both Marika's mother, in her July 2001 deposition, and Marika's attorney, at an April 2002 status conference with the court, made it abundantly clear that Marika wanted nothing further to do with the Girl Scouts.[11]

To demonstrate that a case is moot, defendants must show that the issues involved are no longer "'live' or the parties lack

---

[10]Marika's brief, for example, insists that her counsel's statement in April of 2002 to the effect that she no longer wished to be a Girl Scout is irrelevant to the standing analysis. This is only true to the extent that one views standing through the first of the doctrinal lenses and not the other.

[11]The only evidence proffered to the contrary is an affidavit submitted by Marika after the district court had signaled its ruling on the standing issue. In the affidavit (which was signed by Marika's mother), Marika states that while she would not rejoin the Girl Scouts "as [she] had experienced it," she would rejoin the organization if by court order or otherwise it were to become ADA-compliant. Whatever the import of the affidavit, it was filed seven days *after* the deadline set by the district court for submissions on its proposed ruling on the standing issue – too late to be considered by the district court or by this court on appeal.

a legally cognizable interest in the outcome." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979). A court cannot hear an action that loses "its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." Hall v. Beals, 396 U.S. 45, 48 (1969) (per curiam). To demonstrate the prospect of future harm, the essential prerequisite for equitable relief, a plaintiff must show more than that she has been injured by an unlawful practice. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." O'Shea v. Littleton, 414 U.S. 488, 495-496 (1974). To be entitled to a forward-looking remedy, a plaintiff must satisfy the basic requisites of equitable relief – "the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." Id. at 502. It is not enough for a plaintiff to assert that she "could be" subjected in the future to the effects of an unlawful policy or illegal conduct by a defendant – the prospect of harm must have an "immediacy and reality." Golden v. Zwickler, 394 U.S. 103, 109 (1969). And finally, the relief requested must be personal to the plaintiff. "[A] federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of [officials] are [unlawful]." Lyons, 461 U.S. at 111.

Here, whatever wrongs Marika may have suffered at the hands

of her troop leaders and scouting officials, she had completely severed her ties to the Girl Scouts by, at the very latest, the summer of 2001. As a consequence, there was no live controversy and consequently no prospective relief of a personal nature that the district court could award. Thus, even if the conclusion that Marika lacked standing to pursue equitable relief in November of 2000 was in error – we do not say that it was – the issue had become moot by the time the district court made its ruling.[12]

## CONCLUSION

Because we find no abuse of discretion in the denial of the motion to amend the complaint, and no error in the determination that Marika was not entitled to equitable relief, the judgment of the district court is <u>affirmed</u>.

---

[12]As Marika points out in her reply brief, the Girl Scouts as an organization holds itself out, appropriately, as open to all girls regardless of their backgrounds or physical disabilities. If Marika was subjected to discrimination because of her disabilities – that issue is not before us on appeal – this would be sadly inconsistent with the noble goals of an organization that in its own words is dedicated to helping girls "develop their full individual potential."